UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY ALEXANDER,

             Petitioner,

v.

DAVID SMITH,

             Respondent.

_____/

CIVIL ACTION NO. 02-74852

DISTRICT JUDGE GERALD E. ROSEN

MAGISTRATE JUDGE DONALD A. SCHEER

**REPORT AND RECOMMENDATION**

**I.**    **RECOMMENDATION**:

       I recommend that claims numbered IV, IX and XIII of Petitioner's Application for a Writ of Habeas Corpus under 28 U.S.C. §2254 be denied in their entirety.

**II.**    **REPORT**:

      **A.**    **Procedural History**

       Plaintiff's Petition for Writ of Habeas Corpus was filed December 6, 2002. Respondent filed his Response to the Petition on June 30, 2003, and the record of state court proceedings was submitted on July 9, 2003. On October 29, 2004, the district judge issued his Opinion and Order dismissing ten of Petitioner's original 13 claims in their entirety, and two additional claims in part. The Opinion and Order referred claim IV, and those portions of claims IX and XIII pertaining to the government's use of informant testimony at trial, to the magistrate judge for an Evidentiary Hearing and a Report and Recommendation.[1]

_____

     [1] Petitioner filed a Motion for Reconsideration of the court's Opinion and Order on November 5, 2004. That motion was denied September 27, 2005.

An Evidentiary Hearing was conducted before the magistrate judge on March 2, 2005. At the request of counsel for Respondent, the hearing was scheduled for continuation on May 11, 2005, and again on June 15, 2005. By agreement of the parties, however, Respondent was permitted to submit the affidavit of John N. Kelsey, who was prosecution counsel in the state court proceedings against Petitioner, in lieu of in court testimony. The Affidavit was submitted on August 8, 2005.

The magistrate judge afforded the parties an opportunity to file supplemental briefs to expand upon the arguments submitted at the March 2, 2005 hearing. Petitioner's brief was filed on October 21, 2005, and Respondent's brief was filed on November 4, 2005.

**B.    <u>Factual History</u>**

On July 2, 1998, a circuit court jury in Calhoun County, Michigan, found Petitioner guilty of First Degree Murder in connection with the fatal shooting of Termain Watson on May 2, 1996, in Battle Creek, Michigan. The trial court sentenced Petitioner to life imprisonment without possibility of parole. During the trial of the case, the State presented the testimony of Antonio Postell, who was then an inmate of the Calhoun County Jail, where Alexander was confined during the proceedings. Postell was not directly involved in the incident giving rise to Petitioner's prosecution. His testimony related to incriminating comments about the crime which were made to him by Petitioner on several occasions, both before and during the trial.

Petitioner's trial began on June 23, 1998 and concluded on July 2, 1998. On Friday, June 26, 1998, Postell, who was then confined on numerous charges unrelated to Petitioner's case, made contact through his attorney, Peter Hirsch, with the Assistant Prosecuting Attorney John Kelsey, who was representing the State in Petitioner's case.

2

Hirsch suggested that Postell may have information relevant to the prosecution of Alexander, and that he may be inclined to offer that testimony for exchange for considerations in his own case.  On Friday, June 26, 1998, Mr. Kelsey dispatched Battle Creek Police Officer Timothy Hurtt to speak with Postell at the jail.  On Monday, June 29, 1998, another meeting, involving Kelsey, Hurtt, Postell and Hirsch, took place at the prosecutor's office.[2]  Based upon that meeting, Kelsey agreed to dismiss certain counts against Postell, and to recommend a light sentence on the remaining charges in exchange for testimony against Petitioner.  Kelsey provided a duplicate video tape of his June 29th meeting with Postell to Petitioner's counsel, offered to make Postell available for an interview and filed a Request for Leave to Call Postell as a Witness for the People in their case-in-chief.  After a hearing, the court granted leave.  Postell's testimony was offered on June 30, 1998.

### C.   Issues for Determination

Gregory Alexander's Petition for Writ of Habeas Corpus states three grounds related to the testimony of Antonio Postell.  Ground IV asserts that Petitioner was deprived of his Sixth Amendment Right to Counsel when the State used Postell's testimony against him. Specifically, Alexander alleges that Postell was acting as an agent of the State when he engaged Petitioner in jailhouse conversations relating to the Watson murder during the pendency of the trial.  Ground IX of the Petition alleges that Petitioner was denied his constitutional right to the effective assistance of trial counsel when his attorney failed to object to the introduction of Postell's testimony on the theory enunciated in Ground IV.

---

[2]  A video tape of that meeting was received in evidence at the March 2, 2005 Evidentiary Hearing.

Ground XIII asserts that Petitioner's claims are not procedurally defaulted because the ineffectiveness of his appellate counsel was "cause" for Petitioner's failure to raise his claims on direct review.

In his Opinion and Order of October 29, 2004, the district judge referred Grounds IV, IX and XIII to the magistrate judge for an Evidentiary Hearing and Report and Recommendation.  The magistrate judge was directed to explore the relevant issues, "including whether (1) Antonio Postell was an agent of the State when he elicited incriminating information from Petitioner on June 27 and 28, 1998, (2) trial counsel was ineffective for not objecting to Postell's testimony on Sixth Amendment grounds, and (3) Appellate counsel was ineffective for not raising Petitioner's fourth claim and the relating claim about trial counsel on appeal."

**D.     Summary of Antonio Postell's June 29, 1998 Trial Testimony**

Antonio Postell was called as the final witness in the state's case-in-chief at Petitioner's trial.  Postell testified that he was then incarcerated in the Calhoun County Jail, awaiting trial on numerous felony offenses.  The charges against him included possession of cocaine, fleeing and eluding the police, carrying a concealed weapon in a motor vehicle, felon in possession of a firearm, receiving a stolen firearm, habitual offender status and possession of marijuana.  It was Postell's understanding that, upon conviction, he faced a sentence of seven years imprisonment.  (Trial Transcript (hereinafter "TT"), pages 11-14).[3]

Postell testified that, in the course of his incarceration in Pod F of the Calhoun County Jail, he had come into contact with Gregory Alexander, a person whom he had known in the

_____

[3]  The portion of the trial transcript containing Postell's testimony is Vol. VII, pages 6-65.

4

past. During the week before his appearance at the trial, Postell contacted his attorney and indicated to him that he had information which was relevant to Petitioner's case. He sought an agreement under which he would receive a more lenient sentence in his own case in exchange for his testimony against Alexander. An agreement was concluded, under which Postell would plead guilty to possession of cocaine, a four year felony, and would receive a sentence of five years probation, and no more than one year in the Calhoun County Jail, in exchange for his testimony. It was because of that agreement that Postell appeared and offered testimony. (TT, pages 11-16).

Postell testified to comments made to him by Alexander and relating to the murder of Termain Watson. The first comment occurred in 1996, at Alexander's residence in the Orchard Park section of Battle Creek. Alexander had had an argument with Kevin Kendall, a friend of Postell's. Alexander told Postell that, "if he (Kendall) didn't watch out, he was going to end up just like Termain." Kendall was not present when the comment was made. (TT, pages 16-18).

Postell also testified to a comment made to him by Alexander in approximately 1997, at a party in Battle Creek. At that time, Robert Sango and Guy Portus (aka "Mookie") were being sought by police for the Watson murder. Alexander told Postell that he had helped Sango and Portus kill Termain Watson, but that Sango and Portus were stupid enough to get caught for it. No one else was present when Alexander made the statement. (TT, pages 18-21).

Postell also testified to comments made to him by Alexander during the previous week, while both were confined in the Calhoun County Jail. They were not able to have a face to face conversation, because their cells were on different levels of the same pod.

5

Postell was in an upper level cell (number 18), and Alexander was in the cell below (number 3). A vent connected the two rooms, and Postell and Alexander were able to talk through that vent. (TT, pages 22-23).

On Thursday (June 25, 1998), Alexander told Postell that his trial was about to start, and that Robert Sango was coming to testify against him. Alexander stated that he felt that he was "going to beat the trial," and that, even if he didn't, he would get less time than Sango did. Alexander also stated that he had been downstairs in the jail with Watson's brother and several of his friends. Alexander said "I'm down here with his brother and all these other niggers, and they ain't doing shit. I killed his nigger brother." (TT, pages 23-24). Alexander also told Postell on Thursday that he had a good alibi. (TT, page 32).

Postell testified at trial that he had a number of additional conversations with Alexander over the weekend of June 27-28, 1998. He said that Alexander provided him a number of additional details regarding the murder of Termain Watson during those conversations. Alexander told Postell that he was wearing all black clothing at the time of the shooting. He told him that most of the guns used by the assailants had been hidden in the woods near the scene of the shooting. He told Postell that Watson's companion, Kelly Blythe (aka "Greedy") was shot in the head. Alexander stated that Sango shot the victim's with a "K" (a type of firearm) and that "Jeff" used "some kind of 32." (TT, pages 25-27). Alexander stated that Watson and several of his friends had shot at Sango and Portus in the projects a few days before the murder. Sango and Portus ran to the woods to arm themselves and returned the gunfire, chasing Watson from the projects. The shooting by Watson was the motivation for his murder. (TT, pages 29-30). Alexander told Postell that Watson "must have had a death wish" and should have known that his attack would prompt

6

retaliation.  He described Watson as "stupid" and stated that he (Watson) was "slipping." (TT, page 27).

Alexander told Postell that, on the day of the murder, Jamie (Wyreck) alerted Alexander and Sango that Watson and Blythe were sitting in a car across the street from his house.  Portus was frightened and suggested that the murder plan be abandoned.  Sango, however, was determined to proceed, and the others agreed.  Alexander told Postell that the assailants surrounded the victim's car "like the mob," shooting into the vehicle and "lighting them niggers up."  (TT, pages 25-31).

Also during the weekend, Alexander informed Postell that he had a good alibi because he had instructed his sister to lie in his defense.  He stated that the shooting had occurred at 12:00 o'clock and that the police had arrived at 12:15.  Alexander instructed his sister to tell the police that Alexander was present and had opened the door for her when she returned to their residence at 12:15.  (TT, page 31).

Postell testified that he began taking notes of Alexander's statements during the weekend because he had trouble recalling specifics.  (TT, page 32).  Postell stated that he was testifying mainly to help himself out in his own case.  He testified that he had not received information about the case from anyone else.  Nor had he read the newspapers relating to the Alexander prosecution.  Postell had not received information from Watson's family or friends, and did not feel the need to avenge Watson or to otherwise harm Alexander.  His testimony was simply an effort to help his own cause.  (TT, pages 33-34).

On cross-examination, Postell testified that he didn't really know Termain Watson. He stated that there was never a time when inmates in the top and bottom tiers of the jail were permitted to assemble in a common area at the same time.  Postell testified that he

7

did not contact the police regarding Alexander's statements to him in 1996 and 1997. (TT, pages 35-36).

In response to questions from the trial judge, Postell testified that Alexander had always brought up the subject of the Watson killings during the conversations prior to their meetings in the Calhoun County Jail. In addition, the first jail conversation was initiated by Petitioner. Thereafter, however, Postell began taking notes so that he could clearly recall what was said. At that point, he would ask questions of Alexander, with the intent of eliciting details of the shooting. Postell surmised that Alexander was willing to discuss the murder with him because he was the only one in the pod whom the Petitioner knew from the street that got along with him. The remaining inmates were friends of Watson and his brother. (TT, pages 60-61).

### E.  **Summary of Evidence at the March 2, 2005 Evidentiary Hearing**

####   1.  **Testimony of Arthur Rubiner**

Petitioner's first witness at the March 2, 2005 evidentiary hearing was Arthur J. Rubiner, the attorney who represented Alexander on the appeal of his state court conviction. Mr. Rubiner had been a practicing attorney for 54 years, and he estimated that he had worked on approximately 950 appeals in the State of Michigan. (Hearing Transcript (hereinafter "HT"), page 5). Rubiner had no specific recollection of Mr. Alexander, or of the offense of which he had been convicted. He did identify the brief which he filed on Petitioner's behalf with the Michigan Court of Appeals. (HT, pages 6-7). Based upon his examination of the brief, he testified that he raised five separate issues. When asked if he raised a Messiah issue, the witness stated that he did not know what a Messiah issue is.

8

Rubiner was, however, familiar with the United States Supreme Court doctrine that a Sixth Amendment right is violated when agents of the state deliberately elicit incriminating statements from a defendant in the absence of counsel after he has been indicted.  (HT, pages 8-9).  Rubiner agreed that Sixth Amendment protections attach once a defendant has been indicted.  It was Mr. Rubiner's understanding that, if a defendant has been read his Miranda rights and does not request a lawyer, he can be interrogated.  (HT, page 9).

Mr. Rubiner did not recall a witness by the name of Antonio Postell in Mr. Alexander's case.  When asked to consider that Postell had met with the police, and subsequently obtained information from Alexander and included the information in his trial testimony, Mr. Rubiner recognized the argument that Postell was acting on behalf of the police.  He did not, however, consider it material to the argument that Mr. Alexander's lawyer was not present when his statements were made.  (HT, pages 10-11).

On cross-examination, Mr. Rubiner testified that if he had the facts that Petitioner's counsel had discussed, he would have explored raising the issue.  He did not, however, recall Mr. Alexander ever telling him anything about the issue.  (HT, page 12).  The witness stated that he would not be surprised if there was nothing in the record indicating that Mr. Postell was ever directed by the police to approach and get information from Petitioner.  Had the record reflected such information, he stated that "it's something I would  have certainly investigated."  He would have explored the matter in connection with the right to counsel under either the Fifth or Sixth Amendment.  (HT, pages 12-13).

On redirect examination, Mr. Rubiner was shown page 8 of Vol. 5 of the transcript of Mr. Alexander's trial, containing the prosecutor's statement concerning the meeting between Postell and Detective Hurtt on Friday (June 26, 1998).  Mr. Rubiner acknowledged Kelsey's

9

statement that Detective Hurtt was sent over to interview Mr. Postell.  The witness further acknowledged that he did not try to pursue an examination of the content of Hurtt's meeting with Postell by way of an evidentiary hearing, even though that course was available to him. He testified that he did not explore the issue and create a record because "it didn't challenge [his] attention.  (HT, pages 15-16).  Rubiner explained that, if he did not see an appealable issue on reading a transcript, he moves on to something else.  He admitted the possibility that he overlooked the issue, and cited the additional possibility that he disregarded it for good and sufficient reason.  He had no recollection whatever, however, of why he may have disregarded the Messiah issue in Mr. Alexander's case.  (HT, pages 16-17).

On recross-examination, Rubiner opined that there is nothing unconstitutional about a detective interviewing a witness prior to the testimony of that witness.  Rubiner stated that such facts appear in almost every transcript he has ever read.  He had no specific recollection of the basis for a constitutional challenge in the record of Petitioner's trial.  (HT, pages 18-19).

## 2.    Testimony of Antonio Postell

Petitioner's second and final witness was Antonio Postell.  At the time of the March 2, 2005 evidentiary hearing, Postell was an inmate of the Michigan Department of Corrections.  He was serving multiple sentences for two counts of armed robbery (40 to 70 years), felon in possession (5 years), home invasion, 1st degree (10 to 40 years) and felony firearm, 2nd offense (5 years consecutive to other sentences).  He was sentenced on the above listed offenses on September 12, 2002.  (HT, pages 20-21).  Postell's record of criminal convictions also included two counts of felony firearm in April 2001, for which he received a two year sentence; the narcotics conviction for which he was sentenced to

10

probation in 1999 (pursuant to his agreement to testify against Petitioner); a carrying concealed weapon offense in 1996 and a narcotics conviction in 2000. (HT, pages 22-23). Postell admitted that he is familiar with the legal system and "how the cases work in the system." (HT, page 23).

Postell testified against Mr. Alexander pursuant to a plea agreement with the Calhoun County Prosecutor. It was the first time he had ever testified in exchange for a deal, but he had given the police and prosecutor information about other cases. (HT, page 24).

In March 1998, Postell was arrested on a number of charges, including the drug case on which he pled guilty to possession of cocaine. He was also charged with a gun offense, fleeing and eluding and being a habitual offender. He knew that he was facing a lengthy prison sentence, and he was looking for a way to avoid going to prison. (HT, pages 24-25).

Postell testified that, before speaking with the authorities about Mr. Alexander's case, he talked with them about other cases. He spoke with Detective Tim Hurtt, whom he knew to be a detective with the Battle Creek Police Department. In May 1998, while Postell was in the Calhoun County Jail, he met Detective Hurtt on an attempted murder case as to which he claimed to be an eye witness. He and his attorney met with Detective Hurtt, but Postell could not remember what he said about the case, beyond the fact that he had actually seen the crime. (HT, pages 26-27). Postell testified that he believed Detective Hurtt brought up Gregory Alexander's name in connection with the Termain Watson murder during the conversation about the unrelated case. He testified that Hurtt informed him that Alexander was going to be placed in his housing unit at the jail. (HT, page 28). He testified that Hurtt told him that he was "to come up with these notes about that Greg was supposed to tell me about the Termain Watson murder," because they had a weak case and needed Postell to

11

convict Alexander.  (HT, page 29).  Postell testified that he did what Detective Hurtt asked of him in order to benefit himself.  (HT, page 29).  Postell claimed that Detective Hurtt gave him five pages of handwritten notes containing details relating to the Watson murder.  The notes were not intended to assist Postell in questioning Alexander about the case, but were themselves to be the basis of his testimony.  (HT, page 30).  Alexander was later housed in Pod E of the jail in a cell one tier below that occupied by Postell.  (HT, pages 30-31).

Postell testified that he and Petitioner were located in the jail such that they could see one another only when inmates in one tier or the other were allowed outside of their cells. He was unable to communicate with Mr. Alexander unless he came up to his door.  Postell stated at the hearing that he and Petitioner could not have communicated through the vent system unless Petitioner's cell was directly under his own.  Alexander, however, was never housed directly under Postell's cell, and they did not speak through the vent, despite the fact that Postell testified at the trial that they had done so.  Postell asserted at the evidentiary hearing that his trial testimony on that issue was not true.  (HT, pages 31-32).

At some point during Alexander's trial, Postell made a telephone call to his attorney and told him that he had information regarding Alexander.    Postell testified that arrangements were made for him, Hirsh and Hurtt to meet in the county jail.  He could not remember what day the meeting was held, but he stated that it occurred before the weekend.  (HT, pages 32-33).

12

Postell testified that Alexander was discussed during the meeting.  The only information discussed, however, was that which Postell claimed to have been given by Detective Hurtt.  Hurtt said nothing to Postell about speaking with Mr. Alexander, and Postell denied receiving any specific information directly from Mr. Alexander about the case.  (HT, pages 33-34).

In direct contradiction to his testimony at Petitioner's trial, Postell stated at the hearing that he had not had conversations with Alexander concerning the Termain Watson murder in 1996 and 1997, as he had said at Petitioner's trial.  He asserted that he gave such testimony at trial because he was told to do so by the detective and his attorney.  (HT, pages 34-35).  Before Postell went to the jail in 1998, word on the street was that only Sango and Portus were involved in killing Watson.  Nobody said that Gregory Alexander was involved.  Nonetheless, Postell was not surprised that Alexander was involved in the case.  He simply didn't care.  (HT, page 35).  Postell maintained that he was simply given the notes to testify from at Alexander's trial, and that he simply used those notes to say what he thought "they" wanted him to say.  He didn't reveal that fact at Petitioner's trial because he had been promised that he would be released from the county jail and serve no jail or prison time.  He was simply testifying to get a deal and help himself.  (HT, page 36).

Postell testified at the evidentiary hearing that the Friday (June 26, 1998) meeting was convened to make sure he had everything down because he was the witness who would get Petitioner convicted.  Postell claimed that he knew the purpose of the meeting and that he was working as a state witness on behalf of the prosecution and the police department.  (HT, page 37).  He stated that anything he gathered over the weekend would be obtained on behalf of the prosecution so that they could get a conviction and Postell

13

could get his plea bargain.   Both Hurtt and Postell's attorney were aware of the circumstances.  (HT, page 37-38).

Postell, however, further testified that he did not obtain any information from Mr. Alexander over the weekend.  His information was obtained from the detectives.  During the Friday meeting, Postell, his attorney and Detective Hurtt discussed what Postell wanted in exchange for his testimony.  He claimed that the terms of his agreement were understood at the Friday meeting.  He claimed that, "after they heard me rehearse through the notes I had, they were saying, 'OK, this is what we are going to do and you would get out of the county jail with probation.'" (HT, pages 38-39).  He claimed that such discussions occurred among himself, his attorney, two detectives and the prosecutor.  He was then taken to an office room with a camera, at which time only Postell, his attorney and Detective Hurtt were present.  These events occurred on the same day.  (HT, pages 40-41).  Postell denied that the taped meeting occurred on Monday (June 29, 1998).  He stated that he had several meetings "with him" and was told that one or two of them had been recorded.  He was unsure of the specific days on which the meetings were taped.  (HT, page 41).

Postell did not remember the date of his trial testimony against Alexander.  He did recall that he was the last witness in the prosecution's case.  He asserted that Detective Hurtt and another white officer had told him that the case against Alexander was weak without his testimony.  (HT, pages 41-42).

On cross-examination, Postell admitted that he was familiar with the "system" prior to his involvement with Mr. Alexander's case.  He was well aware that informants could exchange their testimony for a break or a deal with the police or prosecutor.  He admitted that his hearing testimony that Detective Hurtt gave him information regarding Alexander's

14

case was inconsistent with his testimony at the trial.  (HT, pages 42-43).  He claimed that his trial testimony regarding conversations with Alexander in 1996, 1997 and during his jail confinement in 1998 during Petitioner's trial was entirely false.  He stated that he didn't have those conversations with Petitioner, but made them up because Detective Hurtt had instructed him to make his testimony believable.  (HT, pages 44-45).

Postell admitted that he had never recanted his trial testimony in any kind of hearing or affidavit prior to his appearance at the hearing in this case.  He claimed that he had a few meetings with his lawyer and the detectives, and at least two with the prosecutor prior to his testimony against Alexander.  (HT, page 45).  He insisted that the prosecuting attorney met with him on Friday prior to his testimony.  He claimed that the prosecutor, the detectives and his attorney knew that he didn't originally come up with the notes, but that he was to rewrite notes provided to him by the police in his own handwriting to support his testimony.  He claimed that the notes provided to him contained details about how the murder had occurred, and that the prosecutor was present when the notes were given to him.  Postell claimed that the prosecutor deliberately elicited contrary and false testimony from him at the trial that no such notes were provided to him.  (HT, pages 46-47).  He stated that one meeting with the prosecutor was essentially a rehearsal of his false testimony so that it would go smoothly on the stand.  He claimed that he was unsure which of his meetings were videotaped.  He reiterated that he had at least two meetings with the prosecutor, and that the prosecutor knew he was making up false testimony to help himself out.  (HT, pages 47-48).

15

On redirect examination, Postell admitted that he sent someone (Alexander) to prison on false testimony, and that he never corrected that fact because he had gotten his deal and considered it over with.  (HT, page 49).  At the conclusion of Antonio Postell's testimony, Petitioner rested his case for purposes of the evidentiary hearing.

### 3.   Testimony of Timothy Hurtt

Respondent presented the testimony of Inspector Timothy Hurtt, of the Battle Creek Police Department.  Inspector Hurtt has served with that agency for 20 years, and has participated in the investigation of 64 homicide cases.  He was assigned to the Watson murder case only after Robert Sango and Guy Portus had been convicted for that crime.  (HT, pages 52-53).

Hurtt was familiar with Antonio Postell for many years.  He characterized Postell as "in and out of trouble" in the Battle Creek area.  He testified that Postell would approach police with information in order to benefit himself when he was in trouble.  Hurtt had dealt with Postell before, but the Alexander prosecution was the first case in which he contacted the police regarding a murder.  (HT, pages 53-54).

Hurtt testified that he was instructed by Assistant Prosecuting Attorney John Kelsey to go to the Calhoun County Jail and interview Postell.  The order was prompted by a report from Postell's attorney, Peter Hirsch, that Postell had information relevant to the trial of Alexander.  Hurtt (then a detective) received his instructions from Kelsey on Friday, June 27, 1998, which was the fourth day of Alexander's trial.  He went to the jail to interview Postell, but could not recall the details of their conversation.  (HT, pages 54-55).

Hurtt testified that he was familiar with a defendant's right to counsel, and knew that he was not allowed to interview a defendant unless his counsel was present.  He further

16

testified that he has never instructed a witness to get information from a defendant.  (HT, pages 55-56).  He testified that:

> If a person comes to me voluntarily with information, I am allowed to take that information . . ., compare it with what I know, take it back to the prosecution and the decision is made whether or not they want to use that information.  However, from that point on, if I instruct them to do anything in regard to getting further information from the person, that is considered inappropriate.

(HT, pages 56-57).  Hurtt testified that he was aware of that principle because he practiced it.  There was nothing in his knowledge or memory that would indicate that he did something other than his normal routine practice in the Alexander case.  (HT, page 57).

Hurtt testified that only he and Postell were present at the Friday interview.  He did recall a later meeting which he, the prosecutor, Postell and Postell's attorney were in attendance.  Hurtt identified a videotape of the later meeting, which occurred on the Monday following his first meeting with Postell at the jail.  (HT, page 58).  The videotape was marked as Respondent's Exhibit 1 and admitted into evidence, without objection.  (HT, pages 58-59).  The videotape is submitted as an Exhibit to this Report and Recommendation.

On cross-examination, Inspector Hurtt testified that he was involved in earlier cases in which Postell was not a defendant but came forward with information.  Postell did not act as an informant, but supplied the information after the fact.  (HT, pages 59-60).  Whenever he had provided information, Postell was in trouble himself, and he offered it to get help on his own case.  He primarily was looking out for himself.  (HT, page 61).  Hurtt remembered dealing with Postell twice before.  In the first of those cases, he did not use Postell as a witness, and remembered that Postell didn't know what he was talking about.  He could not recall the details of the second case, but did not believe that he used Postell as a witness

17

in that instance either.  (HT, pages 62-64).  Hurtt remembered another case involving a homicide, but could not recall if he spoke to Postell as a suspect or as a witness.  (HT, page 65).

Assistant Prosecuting Attorney Kelsey told Hurtt to interview Postell about the Alexander case, but Hurtt could not recall precisely what Kelsey told him beyond the fact that Postell had approached the prosecution through his attorney.  Hurtt described Hirsch as a very seasoned attorney who does encourage his clients to cooperate in an attempt to better their positions in their own cases.  As a practice, Hirsch's clients would not give full details until they could speak in the presence of counsel.  (HT, pages 66-67).

Inspector Hurtt could not recall the specifics of what Postell told him in the Friday meeting.  He did know why he was talking to Postell, and felt that Postell also knew why he was there.  (HT, pages 68-69).  Hurtt considered it a fair assessment that the state's case against Mr. Alexander was "marginal . . . at best."  (HT, page 70).  He characterized Postell's Friday statement as not "in depth."  He stated that the in depth, detailed information came after Postell was in the jail with Alexander over the weekend.  (HT, page 71).  Hurtt testified that it was fair to assume that he told Postell on Friday that he would tell the prosecutor what Postell had told him.  (HT, page 72).  He testified, however, that Postell was not working on behalf of the police and prosecutor's office after the Friday interview.  Rather, Postell was only working for himself.  (HT, page 73).  Hurtt did not tell Postell to keep his eyes and ears open after Friday.  He had no idea how Postell and Alexander ended up in the same housing pod at the jail.  They were placed by the sheriff at some earlier time.  (HT, pages 73-74).  Hurtt stated that it was safe to say that Postell was doing something to better his own position.  He testified that the decision to use Postell as a witness was not made

18

until after the prosecution found out exactly what information he had.  (HT, page 75).

On redirect examination, Inspector Hurtt reiterated that Postell knew how to work the system to help himself out, and had done so in the past.  In Hurtt's opinion, Postell decided on his own to get information to use in getting himself a deal.  Hurtt did not direct or encourage him to do so.  Rather, Hurtt simply received information from Postell on Friday and passed it to the prosecutor.  (HT, page 76).  The decision was made at the Monday meeting whether or not to use Postell as a witness, depending upon how much information he had.  While conceding the possibility that Postell felt he needed to get more information over the weekend to help himself out, Hurtt repeated that Postell did so without his direction. He further stated that he was not aware of any direction to that effect from the prosecutor. (HT, page 77).  While he had not used Postell as a witness on a previous occasion because he "didn't know what he was talking about," Hurtt considered the Alexander case to be different.  He stated that Postell provided specifics consistent with information already known to the prosecution.  Accordingly, "[w]e believed that he was credible with some of the information . . .," based upon things Hurtt knew about the case.  (HT, pages 78-79).  That is why Hurtt conveyed the information to the prosecutor and set up the meeting for Monday. (HT, pages 78-79).

Inspector Hurtt explained his normal procedure in dealing with someone who is a defendant in a separate case looking for a deal.  Usually, on the initial interview, he asks only a few questions: a) whether the witness has specific information; b) whether he has first hand knowledge; and c) whether he is willing to testify about it.  He stated that "that is pretty much all I would do."  (HT, page 79).  He stated that this procedure was his normal course of practice, and his conduct in the Alexander case would have been consistent with it.  (HT,

19

pages 79-80).

On recross-examination, Hurtt testified that he did not make a credibility assessment on Friday after speaking with Postell.  Rather, he determined that Postell had given information that would make the prosecution believe, or give it reason to believe, that Postell knew what he was talking about with regard to the case.  He further testified that the latter determination occurred on the following Monday.  ("I didn't know what he was going to say until Monday.").  (HT, pages 80-81).  He stated that the ultimate decision as to whether or not to call Postell as a witness was not his call, but rather John Kelsey's.  He did not recall Kelsey asking him whether he thought Postell was telling the truth.  Hurtt characterized Postell's reputation for reliability as "50-50."  (HT, page 81).  Hurtt preferred to have a witness of greater reliability, and reiterated that Postell's reputation for reliability was not good.  (HT, page 82).

In response to questions from the Magistrate Judge, Hurtt testified that he reported on his Friday meeting with Mr. Postell to APA John Kelsey immediately after the interview.  Hurtt was not aware of any meeting between Mr. Kelsey and Postell prior to the one depicted in Respondent's Exhibit 1.  In fact, he was not aware if any other meetings took place, and had no reason to believe that any had occurred.  (HT, page 83).

> **4.    Summary of Antonio Postell's June 29, 1998 Statements to Assistant Prosecuting Attorney John Kelsey (Respondent's Exhibit #1)**

(The videotape depicts four men at a conference room table, identified by John Kelsey as Peter Hirsch, Antonio Postell, Detective Tim Hurtt and himself.)

Mr. Postell confirmed Kelsey's understanding that he (Postell) had contacted the

20

prosecutor's office, through his attorney, during the previous week, and indicated that he had some information with regard to Greg Alexander.  Kelsey then asked Postell to state what information he had first, before any questions would be asked of him.  (VT, page 2). At that point, Postell said "last week when I came in and talked to the detective, he took some notes down of things that he told me while we were both out - - we weren't incarcerated in jail - - he told me about the case, the murder with Tremain Watson."  In response to an inquiry by Kelsey, Postell identified the "he" referred to in his previous statement as Greg Alexander.  (VT, pages 2-3).  Postell then explained that over the weekend, he and Alexander had talked through the vent "'cause our room was above each other and the power went off," and that he had made notes of "everything he told me."  (VT, page 3).  In response to a question by Kelsey, Postell confirmed that neither Detective Hurtt nor anyone else had asked him to take notes or to talk to Alexander about the case.  At that point, Kelsey requested that Postell tell him what Alexander had said, identifying separately the statements that were made before and after the previous Friday.  (VT, page 3).

Postell stated that in approximately 1997, before he was arrested, Alexander told him that he was one of the ones who killed Tremain Watson.  In response to Postell's statement that the killers were Sango and Portis, Alexander said that he was involved in it (the murder) too, but wasn't "stupid enough to get caught . . ."  (VT, pages 3-4).

Postell further declared that Alexander lived in Orchard Park, next door to Kevin Kendall, a friend of Tremain Watson as well as Postell.  Postell stated that Alexander and Kendall were "beefing with each other."  On one occasion, Alexander told Postell that "[i]f your friend Kevin don't watch it, talking all that bullshit to me, that he was going to end up just like Tremain Watson."  (VT, page 4).  Postell could not recall any further declarations

21

by Alexander prior to their joint incarceration.

Postell then turned his attention to declarations by Alexander during their joint stay in the jail, but before Friday, June 26, 1998.  He recalled that Alexander said he thought he was going to "beat the case."  Alexander also told Postell that he (Alexander) thought that Rob (Sango) was "his boy, but he turned out to be nothing but a snitch cause he snitched - - starting snitching on everybody that had something to do with the murder after he got caught . . .."  Alexander further observed that Sango had not received much of a sentence reduction in exchange for his testimony.  (VT, pages 5-6).

Postell also recounted a conversation shortly after Alexander's arrival at the jail in which Petitioner said "I killed Tremain Watson, and now they got me downstairs with his big brother, and he ain't doing shit because he's a pussy."  (VT, page 6).

At that point, Postell's declarations appear to relate to statements by Alexander during the June 27-28, 1998 weekend, as reflected in notes made by Postell.  Alexander told Postell that Jeff (Ragland) had shot a .32 (caliber weapon).  Although Jeff stated in court that he had shot over the car, Alexander declared that Jeff actually shot into the car. Petitioner further stated that the shooting occurred at approximately 12:00 o'clock, and the police arrived at approximately 12:15.  Alexander revealed to Postell that he had told his sister to lie to the police by saying that he (Alexander) was at home at 12:15 to open the door for her.  Alexander also declared that he was wearing all black, and was dressed in a hoodie at the time of the shooting, so that no one would recognize him.  Petitioner also told Postell that he looked into the car after the shooting and observed that Kelly Blythe, Watson's companion in the vehicle, had been shot in the head.  According to Postell, Alexander told him that the weapons used in the shooting had been hidden in the woods

22

near the scene.  Petitioner informed the witness that Robert Sango was shooting an assault rifle (AK).  Alexander said "nigger, we was lined up around the car like the mob.  We was putting them in them niggers."  Petitioner stated that Watson "had a death wish, putting a gun to a nigger head and not using it.  He shoulda known that we was coming back."  (VT, pages 5-8).  Alexander also told Postell that Watson was sitting outside of Guy Portus' house, and that, at the time of the shooting, Jamie Wyreck was also outside the house.  (VT, page 9).

At that point, Postell recalled that Alexander had told him before the previous Friday that Jamie Wyreck was the person who had called to inform him (Alexander) that Kelly Blythe and Tremain Watson were outside of the house.  Wyreck informed Petitioner that Watson and Blythe had asked Wyreck to smoke a cigar with them, but he declined, indicating that he was going to smoke his cigar with one of his girlfriends.  Wyreck then returned to his porch, across the street, and sat for fifteen to twenty minutes before entering the house and calling Alexander.  Petitioner told Postell that Wyreck knew of the murder plot, "and then that's when he stayed in the house, and he knew - - he told me he was one of the ones that knew about them - - they was going to kill them that night."  That is why Wyreck declined the invitation to enter the car and smoke with the victims.  (VT, pages 9-11).  Postell could not determine from Alexander's statements precisely where the killers were located when Wyreck telephoned them.  (VT, page 11).

When asked for more information that Alexander had provided him before the previous Friday, Postell indicated that he had difficulty remembering such details "unless it pops up like how that just did, that conversation, I can't - - that's why I started taking notes after so that I can . . .."  In response to Kelsey's questioning about further details provided

23

by Petitioner before the previous Friday, Postell responded that "he (Alexander) just told me that Michael Kemp - - we called him 'Money Mike' - - him and Mokie (Guy Portus) and Robert Sango - - he said Mokie was scared to do it, and Robert said, 'fuck that nigger.  If he catch us slipping, he going to kill us . . . [s]o we going to go kill him,' and they was all, like, 'OK.'" (VT, page 12).  Postell further reported that Alexander told him of an incident, three or four days before the murder, in which Watson and "some other people" had shot at Sango and Portus.  Alexander stated that Portus ran and got the "AK" and chased them out of the project.  It was at that point that Sango "made up his mind that they was going to kill them . . .."  (VT, page 12).  Postell confirmed that Alexander had told him these things before the previous Friday.  (VT, page 13).

Returning then to the notes of his conversations with Alexander over the previous weekend, Postell reported that Petitioner claimed that he had "a good ass alibi" by reason of his sister's claim that he had opened the door for her at 12:15.  Alexander further told Postell that only one person, Jeff (Ragland) was identifying him.  Petitioner reported that Robert Sango had refused to testify against him because "Rob said it was against his religion."  (VT, page 13).  Portus stated that he asked Alexander about the firearms that were used in the shooting "just to drag out the conversation . . .."  (VT, page 13).  Alexander told the witness that "they were shooting with AKs and .357s."  Postell reported that he then asked Petitioner "who was all the people that went there when they shot up the place . . .?"  Alexander identified "Jamal" (Smith), "Money Mike" (Kemp), Sango, "Mokie" (Portus), Jeff (Ragland), "[a]nd me, Greg Alexander."  (VT, page 14).  Alexander said "we was standing around the car like the mob putting them in them niggers, lighting them up."  Alexander then stated that the only people that knew who committed the murder were Jamie Wyreck,

24

"Roan," and another person whose name Postell could not recall.  (VT, page 14).  In response to follow-up questions from Kelsey, Postell repeated Petitioner's statements about the weapons employed in the murder.  Postell said ". . . he told me Rob was shooting - - grabbed a K out of - - he didn't say 'AK' or 'SK'; he said Rob grabbed a K out of the woods cause he said they had a group of guns stashed in the woods already that was right by the project."  "He was, like, 'most of the heaters we used was already in the woods.  We didn't have to go get them.'"  (VT, page 15).

### F.   <u>Evaluation of Evidence</u>

The court's Order of Reference directed this magistrate judge to conduct an evidentiary hearing.  The following issues were to be explored: (1) whether Antonio Postell was an agent of the state when he elicited incriminating information from Petitioner on June 27 and 28, 1998; (2) whether Petitioner's trial counsel was ineffective for not objecting to Postell's testimony on Sixth Amendment grounds, and (3) whether Petitioner's appellate counsel was ineffective for failing to raise on appeal his trial attorney's failure to object to Postell's testimony on Sixth Amendment grounds.  For the reasons that follow, I find no basis for relief on any of the stated grounds.

The district court's Order noted the lack of any indication in the record of the precise timing of Postell's agreement to assist the prosecution.  The court observed that, "[p]rior to his meeting with the prosecutor on Monday, June 29, 1998, Postell's sole contact with any government agent was his Friday, June 26, 1998 meeting with a detective sent over by the prosecutor to interview him."  (October 29, 2004 Opinion and Order, page 16).  The closing of this "crucial evidentiary gap" was a primary purpose of the evidentiary hearing.

As reflected in the transcript, Postell's testimony at the evidentiary hearing totally

25

undermines Petitioner's claim of a <u>Massiah</u> violation, as alleged in argument IV of his Petition.  Contrary to his videotaped statement and his trial testimony, Postell denied at the evidentiary hearing that he had ever engaged Alexander in conversations relating to the Termain Watson murder.  Not only did Postell deny such discussions with Alexander during their incarceration in the Calhoun County Jail immediately before and during Petitioner's trial, he denied as well his earlier sworn and unsworn declarations concerning incriminating statements by Alexander on occasions prior to their respective arrests.  Clearly, if there were no uncounseled statements by Alexander to Postell, no violation of the Sixth Amendment doctrine developed in the line of Supreme Court cases beginning with <u>Massiah</u> could have occurred.

To be sure, Antonio Postell's hearing testimony does assert facts which would constitute a clear and substantial violation of Alexander's constitutional protections.  He painted a picture of a multifaceted conspiracy to suborn perjury and to deliberately deceive a court and jury by the knowing presentation of false evidence.  Such conduct on the part of Postell, the prosecuting attorney, police and Postell's attorney would unquestionably have deprived Alexander of his due process rights.  <u>Mooney v. Holihan</u>, 294 U.S. 103 (1935) (contrived conviction via knowing presentation of perjured testimony violates due process); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959) (conviction obtained via known false testimony denies due process and failure to correct unsolicited perjury also denies due process); <u>Miller v. Pate</u>, 386 U.S. 1 (1967) (knowing and deliberate misrepresentation invalidates conviction).

Petitioner's supplemental brief quite rightly declares that Postell's hearing testimony, "if believed, clearly would establish an agency relationship and entitlement to relief."  Counsel for the state conceded as much in argument following the hearing (HT, pages 93-

26

94), but contends that any challenge based upon Postell's hearing testimony would be different and distinct from the <u>Massiah</u> claim raised in the instant position. The state maintains in its own post-hearing brief that any claim of contrived conviction by way of knowing presentation of perjured testimony is unexhausted and not properly before the court on this petition. (Respondent's post hearing memorandum, page 7). I find that these contentions need not be analyzed or resolved. Petitioner implies, and Respondent flatly declares, that Antonio Postell's testimony at the evidentiary hearing is unworthy of belief. I could not agree more.

Even a cursory comparison of Antonio Postell's sworn testimony at the evidentiary hearing with his sworn testimony at Petitioner's trial reveals that the two accounts of his participation in Alexander's prosecution are totally irreconcilable. The proper resolution of the issues referred to me requires a determination as to which version of Postell's story, if either, is credible. Based upon my review of his testimony at Petitioner's trial and at the evidentiary hearing, his unsworn statements on the videotape exhibit admitted into evidence, and the sworn declarations of Detective Hurt and former Assistant Prosecuting Attorney Kelsey, I conclude that Postell's testimony at the evidentiary hearing is totally unworthy of belief.

Mr. Postell's credibility is inherently diminished by the fact that he has offered two thoroughly inconsistent accounts, both under oath. The differences between his presentations are so great as to exclude the possibility that they resulted from any cause other than knowing and intentional perjury. The record, as a whole, compels the conclusion that the witness is untrustworthy, and that his testimony cannot be accepted at face value. Accordingly, a fact finder must rely upon other indicators in reaching a conclusion as to the

persuasiveness of his various statements. Traditional questions bearing upon the credibility of a witness include whether or not his statements are: (a) logical and internally consistent; (b) consistent with common experience; (c) consistent with other statements of the same witness concerning the fact in issue; and (d) consistent with other evidence in the case. Other helpful considerations include the likely motivation underlying the statement under consideration, and the motivation of other witnesses whose testimony touches upon the same subject.

I find Postell's testimony at the March 3, 2005 evidentiary hearing to be illogical and internally inconsistent. He stated on one hand that the subject of Alexander's prosecution was raised by Detective Hurtt in an earlier meeting with Postell and his attorney on an entirely different matter. Postell, however, also testified that he initiated his Friday meeting with Detective Hurtt by communicating through his attorney to the prosecution that he had potentially useful information about Alexander. Postell then stated that he was provided "a lot" of information about Alexander's case by Hurtt, who supplied him with five pages of handwritten notes on the subject. He also testified, however, that he made up certain facts relating to conversations with Alexander, on instructions from Hurtt to make his testimony "believable." Postell testified that he, his attorney, the prosecutor and two detectives rehearsed his allegedly perjurious trial testimony, and settled upon the terms of his plea bargain, on Friday. If that were true, there would have been no reason for the Monday meeting depicted in the state's videotape exhibit. Furthermore, if Postell was amenable to telling whatever story the prosecution may have wanted, it seems unlikely that he would have been instructed to testify to conversations with Alexander over the weekend. If he had the power to dictate the entirety of Postell's trial testimony, why would prosecutor Kelsey (or

Hurtt) not have avoided the Massiah issue altogether by directing Postell to claim that the defendant's incriminatory statements were all made before Postell offered his services to the state?   While it is not impossible that two attorneys, and two police officers could conspire to suborn the perjury of a career felon, nothing in the record identifies a plausible reason for them to do so.  Two of Termain Watson's killers (Sango and Portis) had already been convicted.  While the police and prosecutor's office undoubtedly had a desire to prevail in their case against Petitioner, such a benefit pales to insignificance when compared to the personal and professional embarrassment, probable loss of employment and possible prosecution and imprisonment which could follow upon their knowing solicitation and presentation of perjurious testimony before a court of law.  Similarly, while Postell's attorney undoubtedly had a natural desire to secure a good result for his client, that benefit seems disproportionate to the risk to himself in suborning perjury.  I find it highly unlikely that experienced attorneys and police officers would risk severe and permanent damage to their careers to enhance the likelihood of conviction of a single defendant in a single case.  I find it even less plausible that a seasoned detective like Hurtt would deliver to a person with Postell's history a collection of handwritten notes which could constitute documentary evidence of his (Hurtt's) own felonious conduct?

Postell's hearing testimony strikes me as inconsistent with common experience. Virtually every adult is acquainted by first hand knowledge, experience or observation in news and entertainment media with the administration of the courtroom oath obligating a witness to testify truthfully.  Certainly, all police officers, lawyers and judges are throughly familiar with the obligation of every party and witness to offer truthful evidence.  I would venture to say that any seasoned practitioner of the criminal law has participated in jail

house meetings to determine the reliability and potential value of the testimony of a prospective witness. While such meetings are commonplace, I would count it rare indeed that every participant - prospective witness, defense lawyer, police officer and prosecutor - would approach the event as an unabashed effort to sell and purchase false testimony. The risks assumed by any party to such a corrupt enterprise are simply too great to be acceptable under any but the most extraordinary circumstances. I find nothing extraordinary about the case against this Petitioner. While Postell may have been willing to lie in exchange for his own freedom, the benefits to be gained by his attorney, the police officers and the prosecutor were negligible in relation to the penalties they risked in allowing him to do so.

Postell's testimony at the evidentiary hearing is inconsistent with other evidence in the case. The testimony of Detective Hurtt, the affidavit of John Kelsey and the videotape of Postell's June 29, 1998 meeting with his attorney, Hurtt and Kelsey are all consistent with the customary, and entirely proper, effort by the prosecution team in Petitioner's case to secure relevant and material testimony. Kelsey, in his affidavit, squarely denies that he sought anything from Postell other than truthful information. He also asserts that the decision to present Postell's testimony was made only after Kelsey had met with him and his attorney and determined that his story was credible. (Kelsey Affidavit). Detective Hurtt admitted at the hearing that he lacked specific recall of the details of his Friday, June 26, 1998, meeting with Postell. He did recall, however, having been dispatched by Prosecutor Kelsey to speak with Postell, because the latter had indicated through his attorney that he had information pertaining to the state's case against Petitioner. Hurtt further testified about his normal procedures in such circumstances. In his experience, prospective witnesses

30

rarely offered substantial and detailed information on the first meeting.  Rather, they would simply provide sufficient information to assure the prosecution that they were possessed of useful and reliable evidence.  Finally, Hurtt testified that only he and Postell attended the Friday meeting, and that he was unaware of any meeting between Postell and Kelsey other than the one on Monday, June 29, 1998.

The videotape of the Monday, June 29, 1998 meeting is very persuasive.  It reflects a proceeding which would be familiar to any veteran police officer, prosecutor or defense attorney.  Kelsey appears not to be well acquainted with Postell, and not well acquainted at all with the content of his prospective testimony.  Early in the discussion, Postell refers to information which he provided to Hurtt (and not Kelsey) during the previous week.  Nowhere in evidence during the twenty minute tape are the five pages of notes allegedly given to Postell by Detective Hurtt.  Rather, Postell refers to a single page of notes which he claims to have created during ventpipe conversations with Petitioner over the previous weekend.

Postell confirmed on the tape that no one told him to communicate with Petitioner at the jail.  Prosecutor Kelsey instructed Postell to recite the facts known to him prior to asking any questions.  There is no hint of coaching or suggestion on the part of Kelsey, Hurtt or defense attorney Hirsch.  Rather, the tape indicates that Mr. Kelsey was hearing Postell's story for the first time.  Kelsey took notes, asked follow-up questions and slowed Postell down to ensure that he (Kelsey) was understanding the facts correctly.  Kelsey's affidavit reflects that he determined to use Postell as a witness only after determining that his story was credible.  As the videotape appears to depict Kelsey's first exposure to the information, it is reasonable to conclude that no plea agreement or other bargain had yet been

31

negotiated with Mr. Hirsch and his client.  I find the recording to be throughly inconsistent with Antonio Postell's sworn testimony at the evidentiary hearing, and entirely consistent with normal procedures and the evidence produced by Hurtt and Kelsey.

It is worthy of note that the statements by Postell on the videotape are consistent as well with his testimony at Petitioner's trial.  Because his hearing testimony contradicts his earlier utterances, an examination of Postell's motivation at the time of each of his declarations is appropriate.  By his own admission, Postell's motivation in 1998 was to secure an advantageous disposition of multiple serious charges pending against him through trial testimony against Alexander.  Not only are those motivations freely admitted, they are entirely consistent with common sense and legitimate legal policy.  After securing a highly advantageous conclusion of the state's case against him, however, Postell was unable to abstain from further unlawful conduct.  As a result, he lost the benefit of his 1998 plea agreement and received a lengthy term of imprisonment as a consequence of his later offenses.  Thus, at the time of the evidentiary hearing, Postell was facing long term confinement by the Michigan Department of Corrections, the same agency which maintains custody of Petitioner and the other persons convicted for the Termain Watson killing.  It is intuitively obvious that prosecution witnesses are not highly regarded by the defendants whom they help to convict.  It is widely understood that such witnesses face the prospect of retribution.  It is worthy of note that Robert Sango, already convicted and imprisoned for Termain Watson's murder, refused to testify against Alexander.  I conclude that Postell was motivated at the evidentiary hearing to recant his trial testimony against Petitioner in order to prevent or moderate his risk of retribution for his earlier cooperation with the State.  I further conclude that the absurdity of his March 3, 2005 testimony is roughly proportionate

to his fear of retribution.

Unlike Postell, Detective Hurtt and former prosecutor Kelsey have not offered testimony or evidence inconsistent with their earlier positions. Hurtt testified that he received sufficient information from Postell on June 26, 1998 to convince him that Postell had first hand information relating to the Watson murder. While he could not recall the details of his conversation with Postell, Hurtt's testimony at the evidentiary hearing suggests that his viewpoint is unchanged. The detective candidly testified that he would have preferred a witness of greater reliability than Antonio Postell. He further testified that the decision whether or not to use Postell as a witness was not his, but Mr. Kelsey's. Had Detective Hurtt been disposed to suborn perjury in 1998, he could certainly have provided Postell with a more coherent, detailed and incriminating story than was presented by Postell at the trial. Similarly, had he been willing to provide this court with false evidence, he could have fabricated false recollections rather than simply admit that he could not remember the details of his encounter with Postell seven years earlier.

While John Kelsey was not presented as a witness at the evidentiary hearing, his affidavit and his videotaped interview with Postell appear to me to be inconsistent with the proposition that he was willing to suborn perjury in an effort to secure a wrongful conviction of Mr. Alexander. Viewing Postell's evidentiary hearing testimony in light of all of these things, I conclude that Postell's March 3, 2005 account of his dealings with the prosecution in Petitioner's case is a fabrication.

Applying the same standards of analysis to Antonio Postell's testimony at Petitioner's trial, I find it to be far more plausible. Not only is Postell's trial testimony internally logical and consistent, it squares with common experience. Reported criminal cases provide

33

endless examples of wrongdoers who have discussed their unlawful activities with neighborhood associates and jailhouse colleagues. Indeed, Supreme Court authority relied upon by Petitioner in this case involved such a scenario. See, United States v. Henry, 447 U.S. 264 (1980). Postell's trial testimony is consistent as well with other evidence in this case, especially the videotape of his July 29, 1998 meeting with Hirsch, Hurtt and Kelsey. As noted above, I am satisfied that any seasoned practitioner of the criminal law would find the event depicted on the tape to be a typical jailhouse encounter between a prosecutor and a prospective witness. I detect nothing in the tape which would suggest that the proceedings depicted were in any way contrived. Postell's trial testimony is also consistent with the hearing testimony of Detective Hurtt and with the Affidavit of prosecutor Kelsey. It coincides as well with the self-declared motivation of Postell to help his own cause by providing evidence against another target of the criminal justice system. Finally, and perhaps most important, Petitioner Alexander has not denied his jailhouse contacts with Postell. On the contrary, the existence of those conversations is the very basis for the Section 2255 arguments now under consideration. For all of these reasons, I conclude that the trial testimony of Antonio Postell was sufficiently credible for presentation to the jury, and that it should be the basis of analysis for purposes of Petitioner's habeas claims IV, IX and XIII.

### G.    Findings of Fact

Based upon my review of the record of Petitioner's trial and the evidence presented at the March 3, 2005 hearing, I find as follows:

34

1.      On Friday, June 26, 1998, Antonio Postell, through his attorney, Peter Hirsch, notified the Calhoun County Prosecutor's Office that he (Postell) had information relevant to the case then pending against Gregory Alexander.

2.      On Friday, June 26, 1998, Assistant Prosecuting Attorney John Kelsey instructed Battle Creek Police Detective Timothy Hurtt to meet with Postell and evaluate his claim.

3.      Detective Hurtt was acquainted with Postell from earlier investigations in which Postell had come forward with information, always in an effort to improve his own prospects in cases in which he was a defendant.

4.      Postell had never assisted the state as a proactive informant, but had only provided after the fact information.

5.      Antonio Postell and Timothy Hurtt were the only participants in the June 26, 1998 meeting.

6.      During the June 26, 1998 meeting, Antonio Postell told Timothy Hurtt only about incriminatory statements made by Gregory Alexander to Postell prior to their respective arrests and incarceration in the Calhoun County Jail.

7.      The June 26, 1998 meeting between Postell and Detective Hurtt was the only direct contact between the State and Postell regarding Gregory Alexander prior to Monday, June 29, 1998.

8.      At all times relevant to this case, Postell and Alexander were housed in separate cells on different levels of the Calhoun County Jail.

9.      Detective Hurtt played no role in the cell assignments of Postell and Alexander at the Calhoun County Jail, before or after the June 26, 1998 meeting.

35

10.     There is no evidence that Detective Hurtt was aware of the cell assignments of Postell and/or Alexander during the period of their joint incarceration at the Calhoun County Jail.

11.     There is no evidence that Detective Hurtt was aware of Postell's proximity to Alexander in the Calhoun County Jail, or of their capacity for communication by means of the ventilation system.

12.     Detective Hurtt did not request, suggest, encourage or assist any contact or communication between Postell and Gregory Alexander during their joint stay at the Calhoun County Jail.

13.     During their meeting on June 26, 1998, Detective Hurtt advised Postell that he would relay the information received by him from Postell to the Calhoun County Prosecutor's Office.

14.     During their meeting on June 26, 1998, Detective Hurtt did not suggest that Antonio Postell would become a witness for the State in its case against Gregory Alexander.

15.     Antonio Postell acted solely on his own initiative in communicating with Gregory Alexander at the Calhoun County Jail on June 27-28, 1998.

16.     Prior to the meeting of June 29, 1998, as depicted in Respondent's Exhibit 1, neither Detective Hurtt nor Assistant Prosecuting Attorney Kelsey had knowledge that Postell could or would engage Alexander in uncounselled communications relating to the murder of Tremain Watson.

17.     The meeting on Monday, June 29, 1998, as depicted on Respondent's Exhibit 1, was the first meeting between Antonio Postell and John Kelsey relating to the prosecution of Gregory Alexander.

36

18.     No agreement between Postell and the State regarding testimony by Postell against Gregory Alexander was concluded until after the meeting on Monday, June 29, 1998, as depicted on Respondent's Exhibit 1.

H.     **Applicable Caselaw**

In Massiah v. United States, 377 U.S. 201 (1964), the United States Supreme Court held that a defendant was denied the basic protections of the Sixth Amendment when the government used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

Massiah and others were charged in the same Indictment with several related federal drug violations. He retained an attorney, pleaded not guilty and was released on bail. Without Massiah's knowledge, a co-defendant, Colson, decided to cooperate with the government. Colson permitted federal agents to install a radio transmitter under the seat of his automobile. Thereafter, Colson and Massiah held a lengthy conversation in the vehicle, during which the former made several incriminating statements. Massiah did not know that a federal agent in a parked car down the street was listening over the concealed radio to the entire conversation. That agent, Murphy, testified to Massiah's incriminating statements during his trial, which resulted in guilty verdicts on several counts. The convictions were affirmed by the Court of Appeals. The Supreme Court reversed the convictions. Without describing in detail the participation of the informant in the incriminating conversation, the majority found that Massiah's statements had been "deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206.

In United States v. Henry, 447 U.S. 264 (1980), the court considered a situation in which the defendant had been indicted and incarcerated pending trial on a charge of bank robbery.  Government agents contacted a fellow inmate who had provided assistance as a paid informant in earlier cases.  The informant told the agents that he was housed in the same cell block with several federal prisoners, including Henry.  A government agent told the informant to be alert to any statement by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank.  Nonetheless, if Henry initiated conversation, the informant was instructed to pay attention to any information he might reveal.  The informant, Nichols, subsequently reported to government agents that he and Henry had engaged in conversation, and that Henry had told him about the bank robbery with which he had been charged.  Nichols was paid for furnishing the information, and later called as a prosecution witness during Henry's trial.  Henry was convicted of bank robbery.  He raised no Sixth Amendment claim on appeal.  His conviction was affirmed by the Fourth Circuit and his petition to the Supreme Court for Writ of Certiorari was denied.

In moving to vacate his sentence pursuant to 28 U.S.C. §2255, Henry stated that he had just learned that Nichols was a paid government informant.  He further alleged that he had been intentionally placed in the same cell with Nichols so that the latter could secure information about the robbery.  He contended that Nichols' testimony violated his Sixth Amendment right to the assistance of counsel.  The Fourth Circuit Court of Appeals reversed the district court's denial of his Section 2255 petition, and remanded for an evidentiary hearing as to "whether the witness (Nichols) was acting as a government agent during his interviews with Henry."

38

Following an evidentiary hearing, the district court again denied Henry's petition, concluding that Nichols' testimony did not violate his Sixth Amendment right to counsel. The Fourth Circuit again reversed, holding that the actions of the government were inconsistent with the Supreme Court's holding in Massiah v. United States. On appeal to the Supreme Court, the government characterized Henry's incriminating statements as voluntary and not the result of any affirmative conduct on the part of the government agents to elicit evidence.

The Supreme Court affirmed the Fourth Circuit. In writing for the majority, Chief Justice Burger identified three factors as important in determining whether the government had "deliberately elicited" incriminating statements from Henry within the meaning of Massiah.

> First, Nichols was acting under instructions as a paid informant for the government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols.

447 U.S. 264, 270 (1980).

In addressing the first factor, the Chief Justice observed that Nichols had been a paid government informant for more than a year. He further noted that the arrangement between Nichols and the agent was on a contingent fee basis. Nichols was to be paid only if he produced useful information. Thus, "[e]ven if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." 447 U.S. at 271.

In discussing the second factor, the Chief Justice declared that an accused person speaking to a known government agent is typically aware that his statements may be used

39

against him.  The contrary is true, however, when an accused is in the company of a fellow inmate who is acting by prearrangement as a government agent.  "Conversations stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be government agents."  264 U.S. at 273.  The concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed government informant.  "In that setting, Henry, being unaware that Nichols was a government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel."  Id.

In addressing the third factor, Chief Justice Burger cited Miranda v. Arizona, 384 U.S. 436 (1966) in recognizing the existence of "powerful psychological inducements to reach for aid when a person is in confinement."  He further observed that "the mere fact of custody imposes pressures on the accused; confinement may bring into place subtle influences that will make him particularly susceptible to the ploys of undercover government agents."  447 U.S. at 274.  Ultimately, the court held that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the government violated Henry's Sixth Amendment right to counsel."  Id.

The Supreme Court again addressed a case involving uncounselled post Indictment statements to a co-defendant who was operating as an undercover agent for the State in Maine v. Moulton, 474 U.S. 159 (1985).  In that case, Moulton and Colson[4] were both indicted by a county grand jury in Maine on multiple counts of receiving stolen property. Both defendants retained counsel, entered pleas of not guilty and were released on bound.

---

[4] The Colson who was indicted with Moulton is unrelated to the individual who was involved in the Massiah case.  See 474 U.S. 159, 172 n.8.

On November 4, 1982, while both defendants were awaiting trial, Colson informed the local chief of police that he had received anonymous threatening phone calls regarding the charges against him and Moulton, and further indicated that he wished to talk to the police about the charges.  On November 6, before any such meeting occurred, Colson met with Moulton to plan for their upcoming trial.  During the discussion, Moulton suggested the possibility of killing Gary Elwell, a state's witness, and the two defendant's discussed how to commit the murder.  On November 9 and 10, Colson and his attorney met with police authorities.  Colson made a full confession of his participation with Moulton in the crimes with which they were charged, and additional offenses as well.  The police offered a deal under which no further charges would be brought against Colson in exchange for his agreement to testify against Moulton and otherwise cooperate in the prosecution of Moulton on the pending charges.  Colson agreed.

Colson also discussed with the police the anonymous threats he had received, and Moulton's plan to kill Elwell.  At the request of the police, Colson agreed to have a recording device installed on his telephone.  He was instructed to turn the device on whenever he received a telephone call, but to turn it off immediately unless it was a threat or a call from Moulton.  During a period exceeding one month, Colson received no threats.  He did, however, speak with Moulton three times, and the tapes of the calls were turned over to the police.  The taped discussions addressed, to various extents, the charges  pending against Moulton and Colson.  During the third call, the two agreed to meet on December 26 to plan their defense.

Upon learning of the plan for a meeting between Colson and Moulton on December 26, the police obtained Colson's consent to wear a body transmitter and record what was

41

said at the meeting.  Pursuant to that agreement, Colson met with Moulton and recorded a lengthy conversation during which Moulton made numerous incriminating statements, several of which were drawn out by Colson, including loss of memory, reminiscences about the details of various crimes.  Moulton's statements were later admitted into evidence against him at trial.

After Colson's roll as an informant was revealed to Moulton, the state added additional charges against him.  He was convicted on various charges, and appealed on the ground that the admission into evidence of his statements to Colson violated his Sixth Amendment right to counsel.  The Supreme Judicial Court of Maine remanded for a new trial.  As to the admission of Moulton's recorded statements to Colson, the court held that the prosecution could not use against Moulton at trial recordings of conversations where the state knew, or should have known that Moulton would make incriminating statements regarding crimes as to which charges were already pending.  It further determined that those statements may be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced.  The Supreme Court of the United States granted the state's petition for certiorari.

The Supreme Court affirmed the decision of the Supreme Judicial Court of Maine. Justice Brennan, writing for the majority, reviewed the court's decisions in Massiah and Henry rejecting the state's contention that the decisive fact in those cases was that the police had set up the confrontation between the accused and a police agent, he wrote:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the state.  As noted above, this guarantee includes the state's affirmative obligation not to act in a manner that circumvents the protections accorded the

42

> accused by invoking this right.  The determination whether
> particular action by state agents violates the accused's right to
> the assistance of counsel must be made in light of this
> obligation.  Thus, the Sixth Amendment is not violated
> whenever - by luck or by happenstance - the state obtains
> incriminating statements from the accused after the right to
> counsel has attached.  However, the knowing exploitation by
> the state of an opportunity to confront the accused without
> counsel being present is as much a breach of the state's
> obligation not to circumvent the right to the assistance of
> counsel as is the intentional creation of such an opportunity.
> Accordingly, the Sixth Amendment is violated when the state
> obtains incriminating statements by knowingly circumventing the
> accused's right to have counsel present in a confrontation
> between the accused and a state agent.

474 U.S. at 176.  Applying that principle to the facts of the case, the decision noted that the

police suggested to Colson that he record his conversations with Moulton, and arranged for

the recording of those contacts.  Having learned from the recorded telephone conversations

that the two were going to meet, they prevailed upon Colson to wear a transmitter and

record what was said.  In doing so, the police knew that Moulton and their agent were

meeting for the express purpose of discussing pending charges and planning a defense.

> The police thus knew that Moulton would make statements that
> he had a constitutional right not to make to their agent prior to
> consulting with counsel.  As in Henry, the fact that the police
> were 'fortunate enough to have an undercover informant
> already in close proximity to the accused' does not excuse their
> conduct under these circumstances.  By concealing the fact that
> Colson was an agent of the state, the police denied Moulton the
> opportunity to consult with counsel and thus denied him the
> assistance of counsel guaranteed by the Sixth Amendment.

474 U.S. at 487-88 (citations omitted).

43

## I.    <u>Analysis</u>

Based upon my reading of the <u>Massiah</u> line of Supreme Court cases, I am satisfied that the prosecution did not violate Mr. Alexander's Sixth Amendment rights in presenting the testimony of Antonio Postell at his trial. In <u>Massiah</u>, the court held that the government denied the defendant the basic protections of the Sixth Amendment by presenting evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. I find no evidence of deliberate elicitation by the state of the statements offered against Alexander. In <u>Massiah</u>, co-defendant Colson offered proactive assistance to government agents in a continuing investigation. The government plainly understood and accepted the offer. In furtherance of the agreement, they installed a transmitter in Colson's automobile for the express purpose of obtaining self-incriminating statements about charged offenses outside the presence of Massiah's counsel. In the instant case, the only assistance offered by Antonio Postell prior to his Monday, June 29, 1998, meeting with John Kelsey, was the recitation to Detective Hurtt of statements made to Postell by Petitioner long before they were confined together in the Calhoun County Jail, and before charges were filed against Alexander. Detective Hurtt testified that he did not request or even suggest that Postell initiate or engage in any form of communication with Alexander at the jail. Postell confirmed, in the videotaped meeting of June 29, 1998 that he engaged Alexander in conversations entirely on his own, with no encouragement by the prosecution. I am thus satisfied that there was no deliberate elicitation by the state of uncounselled and incriminating post-charge statements as prescribed in <u>Massiah</u>.

In United States v. Henry, the Supreme Court broadened the Sixth Amendment protections it recognized in Massiah.  Henry was indicted and incarcerated in the Norfolk City Jail on charges of armed robbery.  Shortly thereafter, government agents working on the robbery case contacted another inmate of the jail, Nichols, who for some time had been engaged as a paid informant to provide confidential information to the Federal Bureau of Investigation.  Nichols informed the agents that he was housed in the same cell block as several federal prisoners, including Henry.  An agent told Nichols to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the robbery with which he was charged.  Nichols had been a paid government informant for more than a year.  The FBI was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion.  The arrangement between Nichols and the government was on a contingent fee basis.  Nichols was paid only if he produced useful information.  The question before the Supreme Court was whether the government had "deliberately elicited" uncounselled incriminating statements from Henry within the meaning of Massiah.  The court held that, even if the agent did not intend that Nichols would take affirmative steps to secure incriminating information from Henry, "he must have known that such propinquity likely would lead to that result."  447 U.S. 264 at 271.  In reversing Henry's conviction, the court found that:

> [b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the government violated Henry's Sixth Amendment right to counsel.  This is not a case where . . . 'the constable . . . blundered,' rather, it is one where the 'constable' planned an

45

> impermissible interference with the right to the assistance of counsel.

447 U.S. 264, 274-75 (1980).

In the case before this court, the government's witness, Postell, was not a paid government informant.  Rather, he was known only to have provided historical evidence in exchange for leniency in prior cases.  There is no evidence that Detective Hurtt, or any one associated with the prosecution in Alexander's case, was aware that Postell had access to Alexander in the jail for purposes of conversation.  Indeed, the evidence in the case is that Postell and Alexander were housed in different cells, one floor apart, and that conversation was only possible by utilizing the jail ventilation system.  Furthermore, the evidence is clear that Postell received no instruction, request or suggestion that he engage Alexander in conversation, or even be attentive to Petitioner's conversations.  No decision to offer the testimony of Postell at Petitioner's trial was made until after the June 29, 1998 interview by Mr. Kelsey.  Because there is no evidence in the case before this court that the state intentionally created a situation likely to induce Alexander to make incriminating statements without the assistance of counsel, I conclude that the state did not deliberately elicit incriminating statements within the meaning of Massiah, as interpreted in United States v. Henry.

In Maine v. Moulton, 474 U.S. 159 (1985) the Supreme Court further broadened the Sixth Amendment protections against the government's use of uncounselled statements by persons accused of crime.  Moulton was charged with theft by receiving stolen property.  He retained counsel and pleaded not guilty.  Thereafter, a co-defendant, Colson, met with police officers, confessed to his participation with Moulton in the charged crimes and agreed to

46

testify against Moulton and cooperate in the prosecution of Moulton on the pending charges if no further charges were brought against Colson. Colson also consented to have a recording device placed on his telephone. Through recorded calls, the police learned that Moulton and Colson were going to meet to plan defense strategy for the upcoming trial. Police obtained Colson's consent to be equipt with a body wire transmitter to record the meeting. Although Colson was instructed not to question Moulton at the meeting, his remarks did cause Moulton to make incriminating statements. Moulton was convicted, but the Supreme Judicial Court of Maine reversed the conviction, holding that the state could not use against Moulton at trial recordings of conversations where the state "knew, or should have known" that he would make incriminating statements regarding crimes as to which charges were already pending. 474 U.S. 159, 168. The Supreme Court of the United States granted the state's petition for certiorari.

In affirming the Supreme Judicial Court of Maine, the court noted that the Sixth Amendment guarantee of the right to rely upon counsel as a "medium" between a defendant and the state includes the state's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking the right.

> Thus, the Sixth Amendment is not violated whenever - by luck or happenstance - the state obtains incriminating statements from the accused after the right to counsel has attached. However, knowing exploitation by the state of an opportunity to confront the accused without counsel being present is as much a breach of the state's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the state obtains incriminating statements by knowingly circumventing the accused right to have counsel present in a confrontation between the accused and a state agent.

474 U.S. 159, at 176. In applying that principle, the Court found it clear that the state had

47

violated Moulton's Sixth Amendment right when it arranged to record conversations between him and its undercover informant.  The decision noted that it was the police who suggested to Colson that he record his telephone conversations with Moulton.  Those conversations yielded the information that the two co-defendants were going to meet.  The police then prevailed upon Colson to where a body transmitter to record what was said.  The police thus knew that Moulton would make statements to their agent that he had a constitutional right not to make prior to consulting with counsel.  That knowing exploitation of an opportunity to confront an accused without his attorney being present violated Moulton's Sixth Amendment rights.

Based upon the evidence in the case at hand, I find no similar knowing exploitation of an opportunity to confront Alexander without his counsel being present.  As stated above, Postell had never before rendered pro-active service as a police informant.  His prior services to the state consisted entirely of offering historical evidence.  Consistent with that history, his statements to Detective Hurtt on Friday, June 26, 1998 dealt with statements made to him by Alexander prior to their respective arrests and confinement to the Calhoun County Jail.  There is no evidence that Detective Hurtt, or any other state agent involved in the prosecution of Alexander, played any role in their cell assignments at the jail, or were even aware of the potential for communication between them.  In fact, the unrebutted evidence is that Postell and Alexander were housed on different floors, and could communicate only through the buildings ventilation system.  There is absolutely no evidence that Detective Hurtt was aware of Postell's ability or inclination to engage Alexander in conversations relating to his pending charges during the weekend of June 27-28, 1998.  Under the evidence in this case, I find no basis upon which to conclude that there was a

48

"knowing exploitation by the state of an opportunity to confront the accused without counsel being present." In the absence of such evidence, I do not find that the conduct of the prosecution team in any way contravened the Supreme Court's holding in <u>Moulton</u>.

All of the Supreme Court authority relied upon by Petitioner in this case involves circumstances under which the state knowingly and intentionally circumvented a charged defendant's Sixth Amendment right to rely upon his attorney as a "medium" between himself and the government. In each case, agents of the prosecution, by prearrangement, prevailed upon a co-defendant or fellow inmate to serve as a proactive, undercover informant. In each instance it was the prosecution's clear intent to place the defendant in a situation conducive to uncounselled, self incrimination.

In the case under consideration by this court, there is no evidence of knowing and intentional state action to circumvent Mr. Alexander's Sixth Amendment protections. Nor is there evidence of prearrangement. The only interaction between Antonio Postell and the prosecution in Alexander's case was the Friday, June 26, 1998 meeting between Postell and Detective Hurtt. While Hurtt was acquainted with Postell, by reason of previous efforts on the part of the witness to obtain leniency in his own cases by providing information about other violations, he had never served as a proactive undercover informant. The information provided by him to Hurtt at their Friday meeting concerned statements made to Postell by Alexander long before his arrival at the Calhoun County Jail. Nothing in Postell's trial testimony, or his videotaped statements to Kelsey, supports the inference that Hurtt knew, or should have known, that Postell had access to Alexander in the jail, and was inclined to engage him in conversations relating to the charges against him. On the contrary, Postell plainly stated that no one asked him to communicate with Petitioner.

49

Plaintiff argues that this court should follow the authority of the United States Court of Appeals for the Ninth Circuit as stated in Randolph v. People of the State of California, 380 F.3d 1133, 9th Cir. 2004.  In that case, a prisoner named Moore shared a jail cell with Randolf during and several weeks after Randolph's trial on murder charges.  At some point after the judge declared a mistrial, Moore wrote a letter to the prosecutor seeking leniency in his own case, and mentioning that he was Randolph's cellmate.  Moore met several times with a Deputy District Attorney and a detective assigned to Randolph's prosecution, to discuss his possible testimony against Randolph, as well as a plea agreement in his own case.  At some point, Moore told the authorities that Randolph had admitted to the murder which was the subject of the mistrial, and which was scheduled for a new trial.  Despite Randolph's Motion to Exclude his testimony, Moore appeared at the second trial, which resulted in a conviction.

In an appeal of a federal district court's denial of his Petition for Writ of Habeas Corpus, the Ninth Circuit determined that Moore was an agent of the state when Randolph made incriminating statements to him, whether or not an explicit agreement to compensate him had been concluded.  That holding was based on the court's finding that sufficient undisputed evidence showed that the state had made a conscious decision to obtain Moore's cooperation, and that Moore had consciously decided to provide that cooperation.

> If, in fact, the state placed Moore in a cell with Randolph after he indicated his willingness to cooperate with the prosecution, the state 'intentionally create[d] a situation likely to induce [Randolph] to make incriminating statements without counsel's assistance.'

>                 *            *            *

50

> If that is true, [the prosecutor] and [the detective] took the risk that Moore might 'deliberately elicit' information from Randolph within the meaning of <u>Massiah</u> and <u>Henry</u> and that such information would be excluded at trial.  According to Moore's testimony, that is exactly what happened.  Therefore, subject to factual determinations to be made by the district court, Randolph has potentially established a <u>Massiah</u> violation.

380 F.3d 1133, at 1146.  The court remanded the case to the district court for a factual determination as to whether Randolph's incriminating statements to Moore were made before or after he met with the prosecution team.

The case before this court is distinguishable on its facts from the situation presented in <u>Randolph</u>.  The testimony of Detective Hurtt, the Affidavit of John Kelsey and the videotape of the June 29, 1998 meeting established that the state had not made a conscious decision to obtain Postell's cooperation prior to Petitioner's uncounselled statements on June 27-28, 1998.  The purpose of the June 26, 1998 meeting was simply to determine if Postell had relevant information.  Furthermore, there is no evidence that the state knowingly took any action, or knowingly failed to take any action, with the intent to create or exploit an opportunity to elicit uncounselled statements from Alexander.  In his Friday meeting with Hurtt, Postell only discussed incriminating statements made by Petitioner prior to his confinement in the Calhoun County Jail.  There is no evidence that Postell communicated to Hurtt any statement made by Petitioner in the jail.  Postell was not a cellmate of Alexander's, and there is no evidence that Hurtt was aware that he had any opportunity to communicate with Alexander, least of all by means of the jail ventilation system.  The situation presented in this case is far different from that in the <u>Randolph</u> case, where the prosecution team was aware that Moore and the defendant were housed in the same cell, and that Moore was willing to elicit uncounselled incriminatory statements from

51

Randolph in exchange for leniency in his own case.  In fact, Moore had no other means of offering assistance to the state.  In the case at bar, Petitioner's unwise statements to Postell became available to the prosecution by luck and happenstance and not by prearrangement or knowing exploitation of an opportunity to circumvent Sixth Amendment protections. Maine v. Moulton, 474 U.S. 159, 176 (1985).

Even if the facts of this case squared perfectly with those presented in Randolph, the Ninth Circuit decision is not an appropriate authority upon which to make the decision here. 28 U.S.C. §2254(d) provides that:

> (d) an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . ..

28 U.S.C. §2254(d)(1).  On April 18, 2000, the Supreme Court issued a decision in Williams v. Taylor, 529 U.S. 362 (2000), setting forth the standard of review that a federal habeas court must apply under §2254(d) with respect to the effect of federal law.  The court held that a decision of the state court is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this court has on a set of materially indistinguishable facts."    Id. At 412.   The court further held that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this court's decision but unreasonably applies that principle to the facts of the prisoner's case."   Id. At

52

408.  A decision of the Ninth Circuit is not a sufficient authority for a grant of the writ in this case.  Nor may a federal habeas court find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. At 411.

### J.    Ineffective Assistance of Trial Counsel

Petitioner claims that he received ineffective assistance of counsel when his trial attorney failed to challenge the testimony of Antonio Postell on Sixth Amendment grounds as enunciated in the Massiah line of Supreme Court cases.  As stated in the previous sections of this Report, I am satisfied that the prosecution did not violate Petitioner's right to rely on counsel as a "medium" between himself and the state.

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court set forth a two pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel.  First, a Petitioner must prove that counsel's performance was deficient.  That requires a showing that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment.  466 U.S. at 687. Second, the Petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived Petitioner of a fair trial.  Id.

With respect to the performance prong, a Petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  Strickland, 466 U.S. at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  Id. at 689.  "The court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690.  The court must not indulge

in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. Strickland, 466 U.S. at 690. Indeed, trial counsel's tactical decisions are particularly difficult to attack, McQueen v. Scroggy, 99 F.3d 1302, 1311 (6th Cir. 1996), and a defendant's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy. Darden v. Wainwright, 477 U.S. 168, 185-87 (1986). I find that Petitioner has failed to rebut the presumption in this case.

Following his meeting with Antonio Postell on Monday, June 29, 1998, Assistant Prosecuting Attorney Kelsey filed a motion to add Postell as a prosecution witness. The transcript of the hearing on that motion reveals that Kelsey provided Pichlik with a copy of the videotape of the June 29 meeting, and that he offered to make Postell available to defense counsel for purposes of interview. (TT, Vol. VI, pages 3, 8-9). The hearing transcript further reveals that Pichlik knew that Postell and Petitioner were housed in separate cells on different floors of the Calhoun County Jail. He was further aware that Postell and Petitioner had no apparent means of communicating with one another. Based upon the state's motion, Kelsey's arguments, the videotape, and information from Petitioner himself regarding the lack of opportunities for communication with Postell in the jail,[5] defense counsel had no basis upon which to assert that the prosecution had engaged in knowing prearrangement or intentional exploitation of an opportunity to induce Alexander

---

[5] During the hearing, defense counsel Pichlik said: "quite frankly, your Honor, what my client has advised me of is that while they shared they [sic] same pod, they have been in different tiers, and it is his information to me that the correctional officers do not have both tiers out at the same time. They have had no ability to communicate. (TT, Vol. VI, page 14).

to make uncounselled, self-incriminating statements.  In the absence of evidence to support

such an assertion, I conclude that a claim of ineffective assistance based upon the failure

to do so is unsupportable.

Knowing that he had no evidence upon which to accuse the prosecution of knowlingly

and intentionally facilitating Postell's "interrogation" of Petitioner, Mr. Pichlik repeatedly

emphasized the lack of opportunity and/or motive for intercell communications in an attempt

to attack Postell's credibility.  At various times, in cross-examination, his questioning

suggested the improbability of communicating through a vent; and the probability that

Petitioner's cellmates would have overheard such efforts; (TT, Vol. VII, pages 35-36; 44-45;

49-51).  Questions by the trial judge and the prosecutor also highlighted the irony that

Petitioner would confess to Postell alone among his fellow prisoners; and the efforts of the

jail staff to prevent intercell communication.  (TT, Vol. VII, pages 60-61; 63-64).  Mr. Pichlik's

line of questioning, in conjunction with the exposition of Postell's criminal history and the

generous terms upon which he was induced to testify, constituted a legitimate and fully

competent attack on Postell's evidence.  Succinctly stated, I find that Mr. Pichlik was not

ineffective in failing to assert a Massiah claim because the evidence in this case would not

support it.  His alternative avenue of defense was consistent with Petitioner's assertion (to

Pichlik) that he had no ability to engage in jailhouse conversations with Postell.  His attack

on Postell's credibility was aggressive and logical.  "The essential question is whether better

lawyering would have produced a different result."  Ward v. United States, 995 F.2d 1317,

1321 (6th Cir. 1993).  I find that it would not.  I am satisfied that Mr. Pichlik's tactical choice

to attack Postell's testimony on the theory that the jailhouse confessions could not have

occurred was reasonable in light of the evidence available to him - including Petitioner's

representations.  Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000).

A party asserting an ineffective assistance of counsel claim must establish both the deficient performance and prejudice prongs of the Strickland test, but courts are not required to conduct an analysis under both.  Where, as here, a showing of deficient performance has not been made, it goes without saying that no prejudice resulted.

### K.    Ineffective Assistance of Appellate Counsel

Claims of ineffective assistance of appellate counsel employ a comparable test.  See, Smith v. Jago, 888 F.2d 399, 405 n.1 (6th Cir. 1989); Bowen v. Foltz, 763 F.2d 191, 194 (6th Cir. 1985).  Petitioner's appellate counsel, Arthur Rubiner, had virtually no recollection of the facts of this case when he testified at the evidentiary hearing.  Nonetheless, he testified that he "absolutely" would have explored a constitutional claim based upon the right to counsel if he had received information that the police had directed Postell to obtain information from Petitioner.  (HT, pages 11-12).  Mr. Rubiner had no recollection of any evidence to that effect in the record of proceedings or his conversation with Petitioner in this case.  While counsel for Petitioner correctly pointed out a portion of the June 29, 1998 trial record wherein Kelsey described the meeting between Postell and Detective Hurtt on the previous Friday, that fact alone (as discussed at great length above) does not establish an agency relationship.  Nor does it demonstrate the knowing and intentional creation and/or exploitation of an opportunity to undermine Petitioner's Sixth Amendment right to rely on defense counsel as a medium.  Because I conclude that the

56

evidence in the record was, and is, insufficient to support a claim under <u>Massiah</u>, I find that Petitioner's appellate counsel was not ineffective for failing to raise such a claim on appeal.

For all of the above reasons, I recommend that claims numbered IV, IX and XIII of Petitioner's Application for a Writ of Habeas Corpus under 28 U.S.C. §2254 be denied in there entirety.

## III.   <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981), <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>Howard v. Secretary of HHS</u>, 932 F.2d 505 (6th Cir. 1991).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  <u>Smith v. Detroit Federation of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987), <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The

response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Donald A. Scheer
UNITED STATES MAGISTRATE JUDGE


DATED:  February 28, 2006


| Proof of Service |
|---|
| The undersigned certifies that a copy of the foregoing report and recommendation was served on the attorneys of record herein by electronic means and/or U.S. Mail on February 28, 2006. |
| s/Kim Grimes |
| Supervisor, Courtroom Deputy Services |
| Acting in the Absence of Mike Lang, |
| Case Manager |